## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **GREGORY KEMP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No.: 17-cv-1404-JBM** |
| | ) | |
| **FULTON COUNTY ILLINOIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>ORDER</u>

Plaintiff Gregory Kemp, represented by counsel, filed a claim under 42 U.S.C. §1983 against Defendants Fulton County Sheriff Jeff Standard, Sergeant Christopher Ford, and Correctional Officers Tiffany Williams and Sheldon Burget. Plaintiff has joined Fulton County as a necessary party for payment of any settlement or judgment, under 745 ILCS 10/9-102. Plaintiff had requested leave, more than two years after deadline, to amend his complaint to include claims under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691-92 (1978). On October 19, 2020, the Court denied the motion for leave to amend. Plaintiff proceeds, therefore, against Defendants in their individual capacities.

Plaintiff was a pretrial detainee at the Fulton County Jail on September 5, 2016 when he suffered injury at the hands of other detainees. Plaintiff asserts that the actions of the Defendant Jail Officer and Administrators were objectively unreasonable and were the proximate cause of his injuries. Defendants have filed a motion for summary judgment [ECF 64], asserting that they had no notice that Plaintiff was at risk of injury by others. Plaintiff has filed a response and Defendants have replied. For the reasons indicated herein, Defendants' motion for summary judgment is GRANTED.

1

**MATERIAL FACTS**

It is uncontroverted that Plaintiff was detained at the Fulton County Jail ("Jail") on G

Block from February 26, 2016 through September 5, 2016. G Block consisted of six 2-man cells

which opened up to a common area with open bars, outside of which were hallways where the

guards would conduct rounds. The common area containing a sink, toilet, shower, several tables

and a television. On the day in question, Correctional Officer Defendants Williams and Burget

were working the 3 p.m. to 11 p.m. shift. Plaintiff has also named Sergeant Christopher Ford,

although Defendants have provided uncontroverted evidence that during the incident in question,

Defendant Ford was off-premises, conducting a traffic stop. There were also two dispatchers on

the premises, Tashina Bradford and Keith Wojtkiewicz, who are not named as parties.

Plaintiff testified at his deposition that approximately one week prior to the September 5,

2016 incident, he had had a verbal disagreement with two G Block detainees, Bradley Dearborn

and Edwin Galvez, regarding who would be moved into a cell which was to become vacant.

Plaintiff testified that he did not tell jail staff of this disagreement and, prior to September 5,

2016, never notified jail staff that he had issues with, or felt threatened by, others. On the day in

question, the housing subject came up again, with Galvez telling Plaintiff that he, Galvez, was

going to take the vacant cell. Plaintiff was told that if he did not like it, inmates Dearborn and

Lind-Enriquez would take Plaintiff into his cell and beat him. Defendants assert that the

argument was actually over the television, as Plaintiff wanted to watch a game while the others

wanted to watch "Love & Hip Hop." Regardless, inmate Dearborn allegedly threatened Plaintiff

that after the guard walked by, they were going to "get him." Plaintiff testified that he considered

reporting the threat to the guards but did not want to be known as a "snitch." [ECF 64-1 at 98].

Defendants have provided an unchallenged surveillance video of G Block, which documents the events of the incident. Plaintiff was shown the video at his deposition and identified the other inmates depicted there. Plaintiff testified that Mr. Dearborn made the threat shortly before Defendant Burget made his rounds. They video shows an officer, identified by Plaintiff as Defendant Burget, walking by the common area around 7:48:55 p.m. Defendant is seen waving to the inmates and Plaintiff has a brief exchange with him. Plaintiff testified that he asked Defendant about watching a football game that Saturday. At 7:51:00, Plaintiff is seen standing on top of a table directly in front of the television. Plaintiff testified that he was talking to inmate Galvez, whom he describes as Dearborn's "muscle." Plaintiff testified that he "knew I had to deal with [Galvez] first to try to either de-escalated or go ahead and escalated, get it done." [ECF 64-1 at 100]. Plaintiff admittedly threw the first punch and Dearborn and Galvez began beating him.

The video shows a third man, identified as Luis Lind-Enriquez, wearing only boxer shorts, joining in the beating of Plaintiff. Mr. Lind-Enriquez, then returned to his cell and came out with a long wide object which Plaintiff identified as a sock in which a hard "paintball" had been placed. Plaintiff explained that the paintball had been made by drying and rolling paint. Before this, Plaintiff had seen inmates tossing it back and forth, using it as a toy. He had never seen it used as a weapon. Mr. Lind-Enriquez swung the weaponized sock, and is seen striking Plaintiff, likely multiple times, though the video is not clear.

Inmate Lind-Enriquez is also seen throwing a toilet plunger at Plaintiff, missing him, and striking the bars. Inmate Dearborn is seen holding a bucket that was in the cell, but it does not appear that it was used to strike Plaintiff. Plaintiff claims that he yelled aloud for help but there was no response. Plaintiff did not dispute that by 7:55:32 the fight had "mostly stopped."

3

After the fight, Plaintiff is seen cleaning up the common area using, as he described at his deposition, a combination of soap, bleach and water. Inmate Lind-Enriquez is seen leaning into the shower to wash off blood on his chest and arm. Plaintiff testified that the others told him "we'll get you cleaned up and we'll all be cool, you know." [ECF 64-1 at 117]. Plaintiff assured them that he was not going to report the incident.

There appears to be some verbal exchanges and posturing after that, with no physical contact until shortly after 8:16:13 when Plaintiff and Lind-Enriquez appear to engage in a verbal altercation. Plaintiff testifies that he called the other combatants by a derogatory name, indicating that they were cowards for ganging up on him rather than fighting him one-on-one. Plaintiff testified that, in retrospect, "I should have kept my mouth shut." [ECF 64-1 at 123]. Inmate Lind-Enriquez responds to Plaintiff's insult by jumping on a table, evading the other inmates who try to stop him. Lind-Enriquez begins to beat Plaintiff, with Dearborn and Galvez joining in. The fight ends at 8:18:50 with Plaintiff lying apparently motionless on the floor. Plaintiff asserts, and the video demonstrates, that the most significant injuries he sustained were from this second fight.

At 8:19:52 Defendant Williams is seen in the hallway making rounds. She stops, looks into the common area and apparently sees Plaintiff lying on the floor. Shortly thereafter, other officers arrive, with medics arriving at 8:28. The medics move Plaintiff onto a stretcher and remove him from the cell. He was later transported to the hospital.

Defendants and other officers provided testimony that Jail correctional officers are required to perform in-person cell checks every 30 minutes. Generally, these were done 15 minutes and 45 minutes after the hour. There was some conflicting testimony that these times were occasionally staggered so officers' movements could not be tracked. When officers made

rounds, they held a hand-held scanner to a reader outside of each area which would record the time the check was made. In addition, there were surveillance monitors in the dispatch office, the jail office and the Sheriff's office which displayed live video feeds from the security cameras. Absent, in-person cell checks, the only wait for officers to observe inmates was through the monitors.

The rounding logs for September 5, 2016, document that Defendant Burget scanned G Block at 7:52:54, some two minutes before the first fight. Defendant Burget then continued on his rounds, scanned the small holding cell at 7:54:01, and large holding cell at 7:54:35. As Plainitiff notes, there is a several minute delay between the times identified on the surveillance video and the times electronically recorded on the logs.

Defendant Burget testified that there was a suicidal inmate in the small holding cell, and he would often, while making rounds, take 10-15 minutes to speak with this individual. Defendant does not remember whether he spent this amount of time with this inmate during the incident at issue. Plaintiff claims that if he did, he would have been immediately adjacent to G Block during the first altercation, and should have been able to hear Plaintiff call out. Plaintiff asserts, however, that Defendant Burget's hearing was impaired, as he had a history of 60% hearing loss in one ear and 40% hearing loss in the other. Defendant have been prescribed a hearing aid which he did not consistently wear and which he was not wearing on the date in question.

Plaintiff asserts that, before being hired as a correctional officer, Defendant Burget had worked at the Jail as a dispatcher in 2007 or 2008. Plaintiff makes an unsubstantiated claim that Defendant was fired from this position after 90 days due to his impaired hearing. Defendant Sheriff Standard has given sworn testimony that he was unaware of Defendant Burget's hearing

difficulties, and that Defendant was fired as a dispatcher as he had difficulty grasping the intricacies of the job.

Plaintiff states, nonetheless, that if Defendant Burget's hearing were not diminished, he would have heard Plaintiff's cries or the sounds of the fights. The parties have provided a map of the jail. If one is facing the Jail looking North, there is a row of offices, behind which is a hallway with another row of offices, including the Jail Office. Behind this is another hallway with E block to the West and F block to the East. There is a hallway behind these two, with G block immediately behind F Block and H block immediately behind E block. Behind G & H Blocks is another hallway with several rooms. On the back side of these rooms is another hallway off of which the kitchen and small and large holding cells are located.



Plaintiff claims that sound tended to carry through the Jail and that inmates could often be heard in the booking hallway at the back of the Jail, the Jail Office, kitchen, Sergeant's office, dispatch area, and the squad room. While several Defendants admitted this to be the case, there was further testimony that the Jail allowed inmates to control the volume of the televisions in the common areas and, when the volumes were turned up, it was difficult to hear inmates when officers were in other parts of the building.

Plaintiff asserts that, absent hearing difficulty, Defendant Burget would have been able to hear Plaintiff's cries for help at the time of the first fight. Plaintiff asserts that the rounding logs evidence that Defendant was in the area of the small holding cell at the time. Defendant disputes this, asserting that he would have remained in this area only if he had a protracted conversation with the suicidal inmate in the small holding cell. Defendant had testified that, while he had done this earlier that day, delaying his rounds, he did not know whether he had such a conversation during the time at issue. Defendant Burget further testified that it was difficult to hear the cell blocks in that area due to noise from the kitchen and laundry room.

Plaintiff alleges that, although there were video monitors in the jail office, neither Defendant Burget nor Williams viewed the monitor. It is undisputed that Defendant Williams was in the jail office for all times immediately before the second fight. Defendant Burget joined her there when he was done with rounds. Defendant Williams testified that she was doing a spreadsheet of paperwork regarding costs owed by individuals sentenced to weekends in jail. She testified that she likely viewed the Jail Office video monitor as it was her practice to do so "often," but could not state this with certainty. For his part, Defendant Burget testified that he was working at the computer database and did not look at the monitor. It is Plaintiff's position that, between the two incidents of fighting and the visual evidence of aggression between the

inmates, there was approximately a 30-minute period where a simple glance at the monitor would have shown the need for intervention.

Plaintiff is critical of Defendant Williams not hearing the second fight going on in G Block until three minutes into the rounds she began around 8:16 p.m. He claims that Defendant Williams should have heard this sooner as in the Jail "sound indisputably carries." Defendant Williams testified that, as she approached G Block, she heard sounds like "two people wrestling" and a "stomping," but nothing verbal. [ECF 64-3 at 44]. When she saw an inmate laying on the floor, she radioed Defendant Burget to bring the keys for G Block and radioed dispatch for an EMS response.

Plaintiff alleges that Defendants Standard and Ford are liable in their individual capacities for their alleged "lack of leadership." This included allowing Defendant Burget to work as a correctional officer despite his diminished hearing, not sufficiently identifying and separating gang members, allowing the toilet plunger and bucket to remain in the cell for indefinite periods, failing to conduct regular cell shakedowns where the paintball might have been discovered, and approving officers' watching television, rather than the closed-circuit monitors in the jail office. Defendant Williams and Dispatcher Tashina Bradford had testified, however, that the television in the Jail Office was tuned to the inmates' televisions so the content the inmates viewed could be monitored. This appears to have been done for security reasons rather than giving officers a license to watch shows of their own choosing while on duty.

Defendants assert that they had no notice that inmates Dearborn, Lind-Enriquez and Galvez would harm Plaintiff. They note that Plaintiff testified that he and Dearborn had resided together in G Block from February through September with only a single disagreement in the week before, a fact not known to staff. Plaintiff disputes this, providing a September 28, 2016

letter inmate Dearborn had sent to the Central District federal court, asserting that he had been charged with attempted murder of another inmate who was a white supremacist and had used racial epithets against him, apparently referring to Plaintiff. [ECF 76-1]. This letter was considered by the Court as it is construed as being offered for a non hearsay purpose, to substantiate that inmate Dearborn had informed Jail staff of an issue between himself and Plaintiff, rather than as proof of the matter asserted, that Plaintiff made racist comments to Dearborn. However, while Dearborn states that he had complained to jail staff and jail administration about racial comments which many had directed against him, he does not identify Plaintiff as one of the individuals who had made those comments.

Plaintiff, himself, has admitted that he made no prior complaints about his cellmates. In addition, on September 5, 2016, Plaintiff did not tell Defendant Burget of the threat, though he had the opportunity to do so. Defendants note, in fact, that after the first fight, Plaintiff attempted to cover up the occurrence so that the combatants would not get into trouble. Defendants assert, further, that Plaintiff was the aggressor in both fights and that any injuries he sustained were due to his own actions, not Defendants' inaction.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 7477 U.S. 317, 322-23 (1986). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112

F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**OBJECTIVE REASONABLENESS STANDARD**

As Plaintiff is a pretrial detainee, his deliberate indifference claim arises under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17 (2nd Cir. 2017). A different standard applies as, while convicted prisoners may be subjected to punishment short of cruel and unusual, detainees may not be punished at all. *Miranda v. County of Lake*, 900 F.3d 335, 2018 WL 3796482, at *9 (7th Cir. 2018). Under the Fourteenth Amendment standard, a detainee need only establish that defendant's conduct was objectively unreasonable, that Defendants "knew, or should have known, that the condition posed an excessive risk to health or safety" and "failed to act with reasonable care to mitigate the risk." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2nd Cir.2017). This standard is higher than that required to prove negligence, or even gross negligence and is "akin to reckless disregard." *Miranda*, 900 F.3d at 353. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016); *Smith v. Sims*, No. 17- 774, 2019 WL 5430700, at *3 (S.D. Ill.

Sept. 19, 2019), *report and recommendation adopted,*17- 774, 2019 WL 5424118 (S.D. Ill. Oct. 23, 2019) (applying an objective reasonableness standard to a pretrial detainee's failure to protect claim).

## ANALYSIS

As noted, a pretrial detainee's claim of failure to protect is reviewed under a Fourteenth Amendment objective reasonableness standard. *Castro*, 833 F.3d at 1070. The Court must determine, therefore, if there is a material issue of fact as to whether a reasonable individual in Defendants' positions knew or should have known of the risk to Plaintiff. If so, the Court must determine whether there remains a triable issue of fact as to whether Defendants failed to act with reasonable care in response. *Darnell*, 849 F.3d at 35. "With the objective standard, a plaintiff must prove something more than negligence but less than subjective intent, something akin to reckless disregard." *Sims*, 2019 WL 5430700, at *3. *See Miranda*, 900 F.3d at 353 (issue is whether defendants acted "purposefully, knowingly, or perhaps even recklessly…")

Plaintiff relies heavily on the *Castro* case where jail officials placed a combative detainee with plaintiff and ignored plaintiff's attempts to seek help. Within hours, the combative inmate beat and severely injured plaintiff. There, the Ninth Circuit identified a four-point test for evaluating a detainee's failure to protect claim. This called for considering whether defendant made an intentional decision with respect to the conditions of confinement; whether the conditions put plaintiff at substantial risk of serious harm; whether the defendant failed to take reasonable available measures to abate that risk, even though the risk would have been obvious and appreciated by a reasonable officer under the circumstances; and whether defendant's failure caused plaintiff's injuries. *Id.* at 1070–71.

Here, there is nothing in the record which would have placed Defendants on notice that

Plaintiff's cellmates posed a substantial risk of serious harm to him. As a result, there is no evidence that any Defendant intentionally placed Plaintiff in a situation where that risk should have been objectively obvious. In the case at hand, Plaintiff had cohabited with inmate Dearborn for nine months and inmates Galvez and Lind-Enriquez for several months with only one unreported disagreement. In addition, it is undisputed that Defendants did not hear any cries for help which were ignored, as occurred in *Castro*.

Plaintiff claims, however, that inmates Dearborn and Galvez were "Gangster Disciples, Latin Disciples, and [Lind-Enriquez] was some kind of derivative of a Ganger Disciple." [ECF 64-1 at 63]. There is no allegation, however, that the fight was gang-related, so that Plaintiff's placement with affiliated gang members put him at a substantial risk. While Plaintiff would assert that the others were similarly aligned and predisposed to "gang up" on him, it appears that there was little friction between the four principals until September 5, 2016. Plaintiff also asserts that inmate Lind-Enriquez was a violent criminal wanted for murder and aggravated assault. Defendants, however, denied having any such knowledge. *Wilson v. Cook County, Illinois*, No. 19-7824, 2020 WL 5642945, at *3 (N.D. Ill. Sept. 22, 2020) (dismissing detainee's complaint alleging failure to protect where there were no allegations that defendant was aware of "the two prior incidents of inmate-on-inmate violence…")

Furthermore, Plaintiff testified at his deposition that he did not fear Lind-Lind-Enriquez, a Spanish speaking individual, and was helping him learn English. Once again, there is not enough to place Defendants on notice that Lind- Enriquez would attack Plaintiff . It is likely that a reasonable percentage of detainees awaiting trial have been charged with some manner of violence. If Plaintiff's argument were to be universally applied, jails would have to routinely single cell a significant segment of their population and prevent detainees sharing common areas.

The Constitution does not call for such measures. It requires only that officers not intentionally or recklessly put a detainee in harm's way. *See Stidimire v. Watson,* No.17- 1183, 2018 WL 4680666, at *4 (S.D. Ill. Sept. 28, 2018) (paraphrasing Miranda and Kingsley). "[A] plaintiff 'must show that that a defendant acted intentionally or recklessly as he 'knew, or should have known, that the condition posed an excessive risk to health or safety' and 'failed to act with reasonable care to mitigate the risk.'"

As Defendants Standard and Ford are named in their individual capacities, they will be liable to plaintiff only if they personally participated in the deprivation or turned a blind eye to it. This is so, as Section 1983 liability is predicated on fault, so to be liable, a defendant must be "personally responsible for the deprivation of a constitutional right." *Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir.2001) (quoting *Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir.2001)). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Ames v. Randle,* 933 F.Supp.2d 1028, 1037–38 (N.D.Ill.2013) (quoting *Sanville,* 266 F.3d at 740). To be held liable for the conduct of their subordinates, supervisors must "know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir.2010) (quoting *Jones v. City of Chicago,* 856 F.2d 985, 992 (7th Cir.1988)).

It is undisputed that neither Standard nor Ford was on the premises during the events in question. Plaintiff asserts, however, that they intentionally allowed Defendant Burget to work despite his diminished hearing, did not investigate inmates' gang affiliations, allowed cell checks outside the 30-minute interval, did not provide for regular searches of the cells, allowed buckets and toilet plungers to remain in the cells, allowed inmates to paint the premises, and allowed

officers to "watch television" in the Jail Office. To be liable to Plaintiff, however, Defendants Standard and Ford must have intentionally or recklessly put him at a substantial risk of serious harm which could have been avoided through reasonable and available measures. *Sims. Epps v. Patriquin*, No. 18-2983, 2020 WL 4505875, at *3 (N.D. Ill. Aug. 5, 2020) citing *Stidimire*, 2018 WL 4680666.

Here, Defendants deny being aware of Defendant Burget's hearing loss. Furthermore, Plaintiff's assertion that Defendant Burget would have heard the first fight had his hearing been better, is speculative. There is competent testimony that the Jail was often noisy and the area by the small holding cell was particularly so. For instance, Defendant Williams, who is not alleged to have any hearing difficulty, was not aware of the second fight until very close to G Block. In addition, dispatchers Bradford and Wojtkiewicz denied hearing sounds of a fight.

While Plaintiff asserts that the Defendant Officers did not always conduct timely rounds, they did so at the time of the events in question. The record supports that Defendant Berget conducted G Block rounds at 7:48 p.m. and Defendant Williams next rounded there at 8:19 p.m., only 31 minutes later.

Plaintiff also criticizes the Jail's failure to conduct regular cell shakedowns as these were apparently done only if officers suspected the presence of contraband. While a shakedown might have revealed the presence of the paintball, Plaintiff fails to establish that Defendants intentionally subjected Plaintiff to conditions which a reasonable officer would have appreciated as involving a substantial risk of serious harm. Plaintiff does not, for instance, allege a history of detainee-on-detainee violence with homemade weapons so that the failure to do regular shakedowns exhibited recklessness. Again, the lack of known discord on G Block prior to September 5, 2016 would not have placed a reasonable officer on notice of a substantial

risk of serious harm. As for the bucket and toilet plunger, Plaintiff was not struck with either, so they were not a cause of Plaintiff's injuries.

Plaintiff relies heavily on *Castro*, where the defendant officers were found liable at jury trial for failing to protect plaintiff from injury by another detainee. Defendants appealed the trial court's denial of their motion for judgement as a matter of law. The Ninth Circuit denied the appeal, finding that defendants had made an intentional decision to place a combative detainee with plaintiff where a reasonable officer would have appreciated a substantial risk of serious harm. After having done so, defendants did not respond to Plaintiff's tapping on the glass, requesting help. As a consequence, defendants' failures caused the plaintiff's injury.

In the case at hand, Plaintiff had cohabited with the other combatants for some months without evidence of conflict. Plaintiff never requested aid until the beatings began and admittedly denied feeling unsafe before the events of September 5, 2016. As a result, there was no intentional decision by a Defendant to place Plaintiff at serious risk nor would a reasonable officer have appreciated such a risk under these circumstances. Furthermore, it would appear that it was Plaintiff's behavior, starting the first fight and instigating the second by name-calling, something which he admitted he should not have done, which caused his injuries.

Whether or not the decisions made by Defendants Standard and Ford amount to negligence, there is no evidence that they engaged in conduct which was intentional or reckless. *See Wilson*, 2020 WL 5642945, (where defendant had no notice of potential harm to detainee by another, his action "suggests at most negligence, not purposeful or reckless action"). *See also, Epps v. Patriquin*, No. 18-2983, 2020 WL 4505875, at *3 (N.D. Ill. Aug. 5, 2020) (defendant not liable to detainee "where he did not know that [other detainee] was on the precipice of a violent outburst…")

**IT IS THEREFORE ORDERED:**

1) Defendants' Motion for Summary Judgment [ECF 64] is GRANTED. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs. All deadlines, internal settings and pending motions are vacated.

2) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

3) If Plaintiff wishes to proceed in forma pauperis on appeal, his motion for leave to appeal in forma pauperis must identify the issues Plaintiff will present on appeal to assist the Court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also, Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:   12/16/2020

_____s/Joe Billy McDade_____
JOE BILLY McDADE
UNITED STATES DISTRICT JUDGE